[Cite as *Martin v. Payne*, 2021-Ohio-1557.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

ALLAN W. MARTIN, ET AL.,

    PLAINTIFFS-APPELLANTS,                CASE NO. 11-20-05

    v.

VILLAGE OF PAYNE,                     O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Paulding County Common Pleas Court
Trial Court No. CI 19 040

**Judgment Affirmed**

Date of Decision: May 3, 2021

APPEARANCES:

    *Ian A. Weber* for Appellants

    *Byron S. Choka* for Appellee

**SHAW, J.**

{¶1} Plaintiffs-appellants, Allan Martin and Jennifer Martin ("the Martins"), bring this appeal from the November 18, 2020, judgment of the Paulding County Common Pleas Court granting the summary judgment motion filed by defendant-appellee, Village of Payne ("Payne"), on grounds of sovereign immunity. On appeal, the Martins argue that the trial court erred by granting summary judgment in favor of Payne because a genuine issue of material fact existed as to whether Payne was negligent with respect to performing the proprietary function of maintaining its sewer system.

*Background*

{¶2} In 2009 the Martins purchased a residence at 107 N. Maple Street in Payne, Ohio. The residence was on property that had been occupied, at least in part, by a school at some point in the late 1800's. The current residence was built "sometime in the 1920's."[1] (Doc. No. 11, Ex. 11).

{¶3} Prior to purchasing the home, the Martins did not have a professional inspection conducted; however, they did walk through the home and its basement. Allan Martin did not recall having any conversations with the previous owner about water issues in the basement. Nevertheless, the previous owner of the home had installed an "underdrain system under the concrete floor and around the interior

---

[1] This is according to a statement that Jennifer Martin made to the Poggemeyer Design Group.

perimeter of the basement. The system was also installed under the concrete floor along the interior wall running down the middle of the basement in an east-west direction." (Doc. No. 11, Ex. 11).

{¶4} Within two weeks of moving into the residence, the Martins noticed that their sump pump was running every Tuesday and Thursday morning from 12 a.m. to 4 a.m. like "clock work." (Martin Depo. at 27). They also noticed that a "catch basin" adjacent to their property was filling up with "rust-color[ed] water" even when there was no precipitation. (*Id*. at 28-29). The Martins reported the issue to Payne. The Martins were told that there was not an issue caused by Payne because there was no village water or sewer connection running from the specified catch basin to the Martins' basement.

{¶5} Winston Gross, the water plant operator, suggested that to alleviate the water problem the Martins should dig around the property, find any drainage pipes, and cut them off. Gross was familiar with the Martins' property because he had been there before due to complaints made by the previous owner. The previous owner complained that the yard would be full of water when it rained. Gross recalled the previous owner having four sump pumps in the basement that were draining into the yard. Gross ran a dye test for the previous owner and found that the yard was draining into the sump pumps and the sump pumps were pumping water into the yard, establishing that the water was pumping in circles. Gross stated

that he advised the previous owner to drain the pumps into the street but that never happened.

{¶6} After Payne declared that the village was not the source of the Martins' water issue, the Martins had an excavating company excavate around their home on the north and east sides between the catch basin and the residence.  They did not excavate on the south and west sides of the residence at the time because they did not have the money and because the north and east sides were where the "catch basin" was located.  (Martin Depo. at 38).  The excavator found some field tiles in the area and "capped them off;" unfortunately that did not alleviate the problem.

{¶7} Around April of 2010, the Martins had a plumbing service run a camera through an "EverDry system" that had been installed in the basement by the previous owner.  The plumbing service discovered some problems with the EverDry system such as a "swirl" in the system.  As a result of what was learned, Allan Martin was advised by the plumbing service to put a hole in the basement floor with a sledgehammer.[2]  When Allan struck the floor, the floor collapsed, creating a hole roughly three or four feet by six feet.  After digging out chunks of cement that had broken, the plumbing company located tile underneath the basement floor "running eastwardly.  The material, the stone, the dirt was all ate out from underneath the

---

[2] It is not clear from the record what the initial intention was behind putting a hole in the basement floor.

basement, that is why [the plumber] said [the floor] collapsed." (Martin Depo. at 42-43).

{¶8} Further, the plumbing company discovered a pipe underneath the basement. A camera was run through the pipe and the plumbing company determined that it was a drain pipe for the basement that ran to the sewer. The Martins had not been aware of this pipe previously. The previous owner of the residence told Allan Martin that he also was not aware of the drain pipe.

{¶9} The Martins took measures to "vent" the drain pipe and to seal it off so that the pipe would be "cut off" at two points. (*Id*. at 43). In addition, the Martins had a concrete company fill the voids both in and under the basement caused by the drain pipe. According to Allan Martin, around this time the Martins contacted EverDry to have the company look at their system, but EverDry had a fire and had purportedly lost records. Allan indicated that EverDry did not come out to the property or do anything with regard to the system.

{¶10} Fortunately, capping/venting the drain pipe alleviated the issue of the sump pumps running regularly on Tuesday and Thursday mornings. However, Allan Martin indicated that water was still coming into the basement and that it got worse over time, prompting the Martins to add sump pumps so that they had "five or six sump pumps over the years" running out of the same pit. (*Id*. at 52).

{¶11} Around a year after the voids in the basement had been filled by concrete, some of the concrete patches were "blown out" after a heavy rainstorm. The concrete company returned and repaired the blowouts, but they wanted to find the western end of the previously discovered drain pipe, which they did. Since the pipe was already capped off, the company repaired the floor, noting that the Martins had significant water pressure problems. Despite these new repairs, the Martins had water in their basement after heavy rainfalls.

{¶12} In February of 2012, the Martins filed a complaint with the EPA regarding their water issues. The EPA contacted Payne to investigate the matter and report back. Payne then hired the Poggemeyer Design Group to investigate the issues with the Martins' property. Poggemeyer investigated the Martins' property and determined that a six-inch tile under the basement, which had been plugged only on the eastern end, was still conveying water from the west side of the property into the under-the-floor drainage system and into the Martins' sump pit. Poggemeyer stated that the glazed tile that was found indicated that the original house was "constructed over a storm tile associated either with the school or some other drainage." (Doc. No. 11, Ex. 11).

{¶13} Poggemeyer observed moisture on the inside face of the poured concrete foundation wall, which showed that moisture was penetrating the foundation wall from the surrounding ground. Poggemeyer stated that the original

residence likely did not have a basement because there were dissimilar materials making up the exterior foundation walls: "The top portion is concrete block, which appear[s] to be the original foundation wall and beneath the concrete block is a poured concrete wall. The junction of the concrete block and poured concrete is not uniform vertically which leads to my opinion that the basement was added at a later date than the original construction." (*Id.*) Poggemeyer learned from the Martins that a cistern was on the property, likely from when the property contained a school, but the Martins were unsure where exactly the cistern was located.

{¶14} Poggemeyer suggested certain actions to be taken by the Martins to alleviate the water problem such as finding the cistern on the property and determining how the cistern was filled in. Poggemeyer suggested that, if possible, the Martins should determine if there were any active pipes connected to the cistern bringing water to the cistern and possibly bringing water under the floor slab. Poggemeyer also suggested examining the 6" pipe to the west via video to determine where it went and if it was connected to any lateral tiles or catch basins.[3]

{¶15} The Martins did not examine the cistern as Poggemeyer suggested because they spoke with the previous owner and the previous owner stated that the cistern had been filled with cement, dirt, and stone. The previous owner claimed he

---

[3] The Martins indicated the pipe had only been videoed to the east.

had "knocked off the lines, cut the lines off, plugged it up."[4] (Martin Depo. at 91). Regardless of the Martins' actions, as a result of Poggemeyer's report, the EPA determined that Payne had complied with its obligations to the Martins. Poggemeyer did not find that there were any issues with Payne's sewer system that were causing the Martins' issues.

{¶16} Over the next several years, the Martins employed two excavators to dig around their property. The first excavator dug around three sides of the property but not the fourth due to the Martins' money issues. The second excavator did the final side of the property in 2017. The excavators were instructed to dig deeper than the first excavator because the first excavator did not know the lawn was graded. More clay tiles were found on the property as a result of excavation. The tiles were plugged shut; however this did not alleviate the water problem in the basement.

{¶17} In the spring of 2018, the Martins learned that the Ohio Gas Company had cut into a pipe located on their property while installing a new gas line. The gas company spoke with the Village Water Superintendent and he told the gas company to cover the pipe since it was not connected to anything and the pipe was plugged solid on both sides. Shortly thereafter, the Martins began getting gas and sewer smells in their basement whenever it rained. Payne was notified and a village

---

[4] The Martins claimed there was another recommendation that was not included in Poggemeyer's written report, which was to "grade" the lawn. However, Allan Martin stated that the lawn was already graded so this recommendation was not followed.

employee came to the Martins' residence. The employee thought that the smell was merely "stagnant water" rather than gas or sewer smells. Nevertheless, Payne inspected its sewer lines by running a camera down the lines in the area of the Martins' residence. The inspector determined that there was no blockage or any other issues with Payne's operation of the sewer system that could have been causing the Martins' basement issues. The inspection revealed that there was no major damage to the sewer system, that there were no chunks missing in the pipes, and that the sewer was intact.

{¶18} The Martins later received a recording of the inspection of the sewer pipe near their home and they disputed that the system was intact, stating upon their own review of the video, one of the pipes was damaged. The Martins had nothing to support this claim other than their own personal viewing of the video that had been taken, which the inspector for Payne had determined showed a properly functioning sewer pipe.

{¶19} In November of 2018, the Martins had yet another plumbing service inspect the sewer lines of their home and the lines were found to be completely intact. "We did confirm that the sewer line [all the way to the city main] is completely intact and should not allow any ground water, etc. to leach in and back feed through the sewer line." (Doc. No. 11, Ex. 2). Further, the outdoor sump pump line was found to be working properly by those conducting the test.

{¶20} Notably, the plumbing company did not explore the inlet pipes to the Martins' sump pit and the plumbing company was unable to determine the cause of the water incursion or the sewer smell in the basement. "Using our camera on these inlet lines to the sump pit would be able to rule this out as a potential cause." (*Id.*) The plumbing company stated that if the issue of the water incursion could not be resolved, they had a solution to keep water from getting into the basement, which included, *inter alia*, installing an outdoor sump pit with primary and secondary backups.

{¶21} The Martins did not have the EverDry system inspected again at that time because it had been done in 2010. Although it was eight years later, Allan Martin did not believe the EverDry system could have been the problem.

{¶22} Due to the ongoing issues with the Martins' basement and the sewer/gas smells, in 2019, Payne conducted "smoke tests" of the sewer lines around the Martins' property. For a smoke test, the sewer pipe is plugged at two ends and then smoke is pumped into a sewer line along with pressure. Generally, in a successful test, smoke would not be found coming out of unexpected places that are connected to the sewer lines. However, smoke was found coming out of the Martins' sump pit even though it was not connected to a sewer line by Payne.

{¶23} Winston Gross, the water plant operator, emphasized that there was no connection between Payne's sewer lines and the Martins' sump pit. Gross

speculated that there should have been a solid bottom to the sump pit, but there was apparently something hooked into the pit and he did not know why, and it was not done by Payne. He thought that perhaps EverDry had connected something to the pit, but he did not know. Ultimately as a result of the "smoke test," the Martins were told that the problem shown by the test appeared to be with the "traps" in the Martins' residence or from a backup through the "clean out pipe" in the Martins' front yard. Either way, the Martins were told that the problem was on their end, and not a result of anything done by Payne. Nevertheless, a water analysis was conducted of the water in the Martins' basement and it determined that there was some "fecal coliform" in the non-potable water.

{¶24} As to the maintenance of the sewer lines, Payne indicated that the lines were inspected on a monthly basis in addition to whenever a complaint was made. The lines were "jetted"[5] on a rolling basis at least twice a year, the lift station was monitored on a daily basis, and two overflow locations were inspected by Payne employees weekly and after each rainfall.

{¶25} On March 22, 2019, the Martins filed a complaint against Payne alleging that Payne was negligent with regard to the maintenance, inspection, and upkeep of its sewer system. The Martins alleged that water incursion into their basement had been occurring for approximately a decade at that point, and that they

---

[5] Winston Gross defined jetting as running jets of water down the lines, which then drags back any debris, sucking it out of the pipe. Gross stated that jetting the lines would bring back a brick if one was in there.

suspected it was the result of a "broken, failed, and washed-out section of [a] large sewer pipe directly outside" of their home. They claimed that the video inspection of the sewer pipes showed, to their eyes, that the pipe was broken. (Doc. No. 1)

{¶26} In addition to the purportedly broken sewer pipe outside their home, the Martins alleged that Payne had taken measures over the years that strained the capacity of the sewer pipes such as "bridging" sewer pipes from another area and tying them directly into the sewer pipe running past the Martins' home.

{¶27} The Martins alleged that the gas, sewage smell, and airborne contaminants caused them to leave their home multiple times, and that the issues also resulted in exposure-related illnesses.[6] The Martins stated that they, and/or their predecessors in interest, had taken numerous diagnostic, preventative, and remedial measures to protect the home and basement such as waterproofing, installing as many as seven sump pumps into the same pit, having concrete injected into voids developed beneath the basement floor due to water erosion, and employing numerous professionals to find and fill tile/pipes on their property. Ultimately the Martins alleged that as a result of Payne's failure to properly perform regular inspections, failure to perform regular maintenance, and Payne's failure to remedy the problem with the sewer system despite numerous complaints, the Martins had suffered in excess of $60,000 in damages.

---

[6] The Martins claimed that household members had issues with Hepatitis E and Giardia (ingesting feces) as a result of the problems.

{¶28} On April 29, 2019, Payne filed an answer denying negligence and asserting multiple affirmative defenses including, *inter alia*, that it was entitled to sovereign immunity pursuant to R.C. 2744.02, that the Martins' own negligence caused the problem, that the Martins were aware of any issues with the property when they purchased their home, that Payne discharged any duty owed to the Martins, and that any damages were the result of a superseding or intervening cause.

{¶29} As the case proceeded, discovery was exchanged and three depositions were taken. Allan Martin—one of the homeowners—was deposed, Winston Gross—the water plant operator until he retired in June of 2018—was deposed, and John Hall—the president of the Board of Public Affairs—was deposed. Those depositions were filed with the trial court.

{¶30} On January 27, 2020, Payne filed a motion for summary judgment arguing that it was entitled to immunity as a political subdivision in this matter. Payne argued that despite numerous inspections, including some done by businesses employed by the Martins, the Martins had not established *any* defects with Payne's sewer system. Further, Payne argued that the undisputed evidence established that routine inspection and maintenance occurred on the sewer system, thus the Martins could establish no breach of Payne's duty to the Martins, *or* any causation in this matter.

{¶31} On March 3, 2020, the Martins filed a response to Payne's motion for summary judgment. The Martins contended that despite numerous inspections the problem with water ingress into their home had not been identified. Additionally, the Martins argued that the smoke test performed by Payne resulted in smoke "pouring into their basement," establishing that there was a leak somewhere. Moreover, the Martins claimed that there was "obvious" damage to the regularly inspected sewer line under the street immediately in front of the Martin's home as evidenced by video of the 2018 line inspection.

{¶32} Further, the Martins argued that they had "eliminated" any other possible causes on their own property, thus the problem must be due to Payne and the "damaged" sewer system that they claimed was shown by the video inspection. Moreover, they argued that per the deposition of John Hall, the sewer system was not inspected in its entirety due to a bend in the system. Finally, the Martins claimed that Payne had lost EPA report records for roughly a year pertaining to inspections, placing the issue of whether Payne was actually having regular inspections into dispute.

{¶33} On March 19, 2020, Payne filed a reply in support of its motion for summary judgment arguing that no defects with Payne's sewer lines had ever been discovered, that the Martins had no evidence showing that the basement issues were related to some defect or damage to the Payne sewer system, and that Allan Martin's

lay interpretation that the sewer pipe was damaged was not sufficient to create a genuine issue of material fact where the only experts in the matter had stated that the pipe was not damaged.

{¶34} On November 18, 2020, the trial court filed a judgment entry granting Payne's motion for summary judgment. In the entry, the trial court recited evidence presented through deposition testimony and various letters written after inspections had been made of the Martins' property. The trial court found that although the testimony of Allan Martin would cause any homeowner to "empathize" with him, the Martins had offered "not one professional that would say that the [Martins'] basement issue was caused by the negligent maintenance of the sewer system by the Village of Payne. Neither the presence of water, fecal material or smoke is sufficient evidence to support [the Martins'] claims of negligence against [Payne]." (Doc. No. 16). Thus Payne was granted summary judgment and the Martins now appeal, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Whether the trial court erred in granting the Appellee's motion for summary judgment pursuant to Civil Rule 56(C).**

**Assignment of Error No. 2**
**Whether the trial court as a matter of law erred in granting the Appellee's motion for summary judgment pursuant to Civil Rule 56(C).**

{¶35} Appellants' assignments of error are interrelated and argued together in their brief, therefore we will address them together.

*First and Second Assignments of Error*

**{¶36}** In their assignments of error, the Martins argue that the trial court erred by granting summary judgment to Payne. More specifically, the Martins contend that there was a genuine issue of material fact as to whether Payne was negligent in maintaining its sewer system.

Standard of Review

**{¶37}** We review a grant of summary judgment de novo—that is, we will consider the evidence as if for the first time—using the standard set out in Civ.R. 56. *Hudson v. Petrosurance, Inc.,* 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29. A court may grant summary judgment only when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and, viewing the evidence in the light most favorable to the nonmoving party, reasonable minds can reach a conclusion only in favor of the moving party. *M.H. v. Cuyahoga Falls,* 134 Ohio St.3d 65, 2012-Ohio-5336, ¶ 12, citing *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327 (1977), citing Civ.R. 56(C).

Sovereign Immunity Framework

**{¶38}** A claim of sovereign immunity by a political subdivision requires the three-tiered analysis provided in R.C. Chapter 2744. *Baker v. Wayne Cty.*, 147 Ohio St.3d 51, 2016-Ohio-1566, ¶ 11, citing *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.,* 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 16. Under the first tier of

the analysis, a political subdivision has immunity for any act or omission of the political subdivision, or its employees, that was conducted in connection with a governmental or proprietary function. R.C. 2744.02(A)(1). The second tier of the analysis examines whether any of the five exceptions to the general grant of immunity apply that are listed in R.C. 2744.02(B). *Rankin* at ¶ 18. If an exception does apply, the third tier of the analysis considers whether sovereign immunity can be reinstated by one of the statutorily listed defenses, such as the discretionary defenses set forth in R.C. 2744.03(A)(3) and (5). *Rankin* at ¶ 27.

## Analysis

{¶39} In this case there is no dispute that Payne is a political subdivision that is generally entitled to immunity pursuant to R.C. 2744.02(A)(1). Thus there is no factual or legal dispute in this matter with regard to the first tier of the sovereign immunity analysis.

{¶40} With regard to the second tier of the sovereign immunity analysis, the parties are in agreement that, by definition, "[t]he maintenance, destruction, operation, and upkeep of a sewer system" is a proprietary function. R.C. 2744.01(G)(2)(d). Further, the parties agree that pursuant to R.C. 2744.02(B)(2), "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions[.]" Thus the parties agree that there is an exception to Payne's

general immunity in this matter *if* the Martins could establish that Payne was negligent with regard to the maintenance, operation, or upkeep of the sewer system. However, it is important to emphasize that once a political subdivision establishes general immunity, which is not disputed here, the burden shifts *to the plaintiff* to show that one of the exceptions to immunity applies. *Slane v. Hilliard*, 10th Dist. Franklin No. 15AP-493, 2016-Ohio-306, ¶ 31.

{¶41} In this case the Martins contend that they have, at the very least, established that a genuine issue of material fact exists as to whether Payne was negligent with respect to the maintenance, operation, and upkeep of its sewer system. In support of their argument, the Martins contend that video they had obtained from the inspection of the sewer system "clearly shows the clay tile outside of the [the Martins'] home [was] [] badly damaged." (Appt.'s Br. at 13). The Martins argue that with the camera paused, it "is clear that the majority of a section of sewer tile has been broken, collapsed, and is no longer in place[.]" (*Id.*) Allan Martin stated that he could personally see that the sewer pipe was damaged; however, the Martins did not present any evidence from any professionals who stated that the sewer pipe was damaged *or* that the purportedly damaged pipe was responsible for the Martins' issues in their basement. Nevertheless, the Martins argue that their interpretation of the video of the sewer pipe inspection creates a

genuine issue of material fact as to whether Payne was properly maintaining the sewer system.

{¶42} The Martins also allege that Payne "lost" records that would show that Payne had been actively inspecting the sewer lines, calling into doubt the testimony that the lines were regularly inspected. Finally, the Martins argue that testimony established that not all portions of the sewer system were regularly inspected, which showed that Payne was derelict in its maintenance and upkeep duties.

{¶43} By contrast, Payne argues that the only evidence in the record established that the sewer system was routinely inspected, jetted, and maintained, that the sewer lines near the Martins' home had been inspected on a number of occasions, and that no defects or damages to that sewer system had been discovered. Payne emphasizes that the Martins did not offer evidence from any professionals, experts, or contractors that had been employed over the years to show that the issues in the Martins' basement were related to some defect or damage in Payne's sewer system. Finally, Payne argues that Allan Martin's lay opinion that Payne's sewer operation must be at fault for their issues was not sufficient to defeat summary judgment.

{¶44} After reviewing the evidence presented, the legal authority, and the arguments of the parties, the trial court determined that any person would "empathize" with the issues the Martins had to deal with; however, the trial court

found that the Martins had not shown that Payne had breached its duty with regard to a proprietary function or that any purported breach by Payne specifically caused damage to the Martins.

{¶45} Following our own review of the record, we agree with the trial court on all accounts. The Martins have had repeated misfortunes with water/sanitation issues in their basement, but the focus of this action is on the purported negligence of Payne, and whether the Martins have established a genuine issue of material fact with respect to Payne's operation, upkeep, and maintenance of its sewer system. Payne presented evidence that the sewer lines were regularly inspected, maintained, and jetted. The Martins' argument that some inspection or maintenance records spanning roughly a year may have been lost does not create a genuine issue of material fact where the only evidence in the record is that the sewer lines were maintained. The depositions of Winston Gross and John Hall established as much.

{¶46} Further, when looking at the actions of Payne in this matter, the evidence established that Payne was responsive when the Martins contacted the village with issues—although the Martins may not have *liked* the responses they received from Payne. Payne had employees speak with the Martins and investigate the issues when Payne was presented with them. When the EPA complaint was made, Payne hired an outside firm to investigate the matter, and there were no issues found with Payne's operation of the sewer system.

{¶47} In addition, when the Martins continued to have problems over the years, Payne ran a camera through the sewer lines to ensure that the sewer lines were intact. The camera operator determined that there were no damaged areas that would have caused problems for the Martins. Then, to further respond to the Martins' issues, Payne conducted a "smoke test" to check for any issues with the pipes. Payne has thus presented evidence that it has not ignored the Martins' problems, that it has maintained and checked the sewer lines, and that Payne has taken steps to ensure that the problems in the Martins' home did not reside with the village's sewer lines.

{¶48} To contradict Payne's evidence regarding the maintenance and upkeep of the sewer system, the Martins point to Allan's testimony that the sewer pipe looks damaged *to him*. However, Allan Martin's bald claim that he thinks that the camera footage shows that the sewer pipe near his home was damaged is not enough to defeat summary judgment. "[A] non-movant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence." *White v. Sears, Roebuck & Co.*, 10th Dist. Franklin No. 10AP-294, 2011-Ohio-204, ¶ 9; *Dalzell v. Rudy Mosketti, L.L.C.*, 2d Dist. Clark No. 2015-CA-93, 2016-Ohio-3197, ¶ 22; *Boulton v. Vadakin*, 4th Dist. Washington No. 07CA26, 2008-Ohio-666, ¶ 20; *Mobley v. James*, 8th Dist. Cuyahoga No. 108470, 2020-Ohio-380, ¶ 43. The

Martins had the opportunity to introduce affidavits or depositions into the record that would support their bald claim that the pipe was damaged and causing their issues but they did not.

{¶49} Moreover, while there is no evidence in the record establishing Payne's negligence with respect to Payne's operation of its sewer system, the record does show numerous potential issues with regard to the Martins' own property. For example, John Hall testified in his deposition that there was likely a problem with the Martins' "clean-out" pipe, which was something that was put in by one of the property owners, not Payne. Hall testified that this was likely the cause of the smoke coming from the sump pit during the smoke test.

{¶50} Furthermore, the record establishes that the Martins have not re-inspected their EverDry system since 2010 despite the worsening problems with water in their basement. Given that a "swirl" was found in the initial inspection of the system back in 2010, which was apparently a problem with the system, the Martins may have wanted to check the system again. In addition, the Martins did not inspect the cistern on the property despite Poggemeyer's suggestion to do so following the EPA investigation in 2012. Rather than inspecting the matter themselves, the Martins simply accepted the previous owner's word that the cistern had been properly filled in and that any connected pipes had been capped. Moreover, the Martins also did not have the inlet pipes to their sump pit inspected

by the plumbing company in 2018, which the plumbing company indicated would help rule-out any issues with the pit or connections to it.

{¶51} All of these issues show that, in addition to producing no evidence that an issue with Payne's sewer system caused the Martins problems, the record contains evidence supporting many causation possibilities for the Martins' problems. The Martins may feel that they have exhausted their options in this matter and that their issues must be Payne's fault, but the record does not establish this fact.

{¶52} In sum, the record establishes a long history of the Martins, and the previous owner of the residence in question, attempting to remedy the water conditions in the basement. However, despite Payne filing a well-supported motion for summary judgment, the Martins have produced no evidence that there is a defect with Payne's sewer system that is causing their water issues. As far as the record establishes, Payne has still yet to be informed by *any* professionals that there is, in fact, a defect in Payne's sewer system. *See Tangler v. Village of Carrollton*, 7th Dist. Carroll No. 17 CA 0920, 2018-Ohio-1343, ¶ 25 (reversing denial of sovereign immunity in summary judgment case where, *inter alia*, evidence had not established that village breached its duty with respect to operation of sewer lines). The only evidence in the record shows that the sewer lines are regularly inspected, jetted, and maintained. For all of these reasons, the Martins' first and second assignments of error are overruled.

*Conclusion*

{¶53} For the foregoing reasons the Martins' assignments of error are overruled and the judgment of the Paulding County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and MILLER, J.J., concur.**

**/jlr**