[Cite as *Darling v. Tribute Contracting & Consultants, L.L.C.*, 2025-Ohio-4624.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| Collis C. Darling, et al., | : | Case No. 24CA1 |
| Plaintiffs-Appellees, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Tribute Contracting & Consultants, LLC, et al., | : | **RELEASED 10/2/2025** |
| | : | |
| Defendants-Appellants. | | |

_____
<u>APPEARANCES</u>:

Steven G. Carlino, and Kaitlin L. Madigan, Weston Hurd LLP, Columbus, Ohio, for appellant.

Justin R. Blume, The Blume Law Firm, LLC, Wheelersburg, Ohio, for appellees.
_____
Hess, J.

{¶1}   The village of South Point, Ohio (the "village") appeals from a judgment of the Lawrence County Court of Common Pleas which denied it summary judgment on the ground of political subdivision immunity in a negligence action regarding a water line break.  The village presents four assignments of error asserting the court erred when it: (1) found political subdivision immunity in R.C. 2744.03(A)(3) did not apply to the village, (2) found political subdivision immunity in R.C. 2744.03(A)(5) did not apply to the village, (3) considered certain testimony, and (4) found questions of fact existed regarding the leak detection system.  For the reasons which follow, we sustain the third and fourth assignments of error, reverse the trial court's judgment, and remand to the trial court to

enter summary judgment in favor of the village and for further proceedings consistent with this decision.  This decision renders moot the first and second assignments of error.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}    In August 2022, Collis C. Darling and Linda C. Darling filed a three-count complaint against the village, Tribute Contracting & Consultants, LLC ("Tribute"), and John Doe 1 and 2—the employees, agents, or assigns of the village and Tribute. The complaint alleged the village owns and operates a water purification and distribution system. Count One alleged the village had a duty to the Darlings to properly maintain water lines within village limits, and on or about May 26, 2022, the village negligently failed to maintain the lines servicing the Darlings' property, resulting in a line break.  Count Two[1] alleged the village contracted with Tribute to replace part of the line that provided or provides service to the Darlings' property, and the village also did some work related to the repair or replacement of the line. The count further alleged the defendants had a duty to perform work related to the repair or replacement "properly and in a workmanlike manner," that they were negligent in repairing or replacing the line, and that on or about May 26, 2022, it broke. Count Three alleged the village and Tribute were liable for the conduct of John Doe 1 and 2, which occurred in the scope of their employment. The complaint alleged the defendants' negligence caused the Darlings to suffer property damage, loss of enjoyment of their property, and a diminution in property value. The complaint requested actual, statutory, and punitive damages, attorney's fees, litigation costs, and court costs. The Darlings later filed a notice of dismissal of their punitive

---

[1] Count Two is incorrectly labeled as Count One in the complaint.

damages claims against the village and a stipulation to the dismissal of their claims against Tribute.

### A. Deposition Testimony of Collis Darling

**{¶3}** Mr. Darling testified that he and his wife own real property in the village. Mr. Darling thought the village contracted with Tribute to install a new water line on their street to replace the old one. On May 26, 2022, Tribute worked on the Darlings' street, "lines were getting shut off and on," and Mr. Darling saw Russell McDonald, the village administrator, "out there on one of the valves doing something with the valve there late in the evening." On May 27, 2022, around 6:15 a.m., the Darlings' tenant notified Mr. Darling that there was a bad leak in the driveway. Mr. Darling was "shocked by the amount of water" and realized there must be a water line break in front of the driveway. His wife contacted the mayor's wife, and a crew came to repair the break around 8:00 a.m. Mr. Darling testified about the property damage from this incident.

### B. Deposition Testimony of Jeffrey Gaskin

**{¶4}** Jeffrey Gaskin,[2] the village's mayor, testified that the village started providing water service in the mid-50s and that its system has needed replaced for years. In 2020, the village began discussions about replacing the lines. At some point, the village authorized two waterline replacement projects. The village, which has an annual budget of around $8,000,000, replaced $3,000,000 worth of lines. The village had as many as 15 water breaks a year and tried to replace the most break-prone areas first. To Gaskin's knowledge, the village had not been able to determine what caused the break at issue but also had not conducted any investigations to determine the cause.

---

[2] The record contains different spellings of Gaskin's first name. We have used the spelling in his deposition testimony.

### C.  Deposition Testimony of Russell McDonald

{¶5}   McDonald testified that he is responsible for day-to-day operations of the village's utilities.  McDonald testified that the village has a maintenance schedule for water lines and that twice a year, the village flushes the lines to adjust iron and magnesium levels and performs "valve exercising," which involves turning valves on and off numerous times.  McDonald assumed that the village began providing water service to residents in "the mid 50s" and that the main water line had been installed in 1956.  Around 2018, the village started to discuss replacing the line due to the number of breaks, and he guessed the village decided to proceed with replacement in 2019 or 2020.  He testified that Tribute did not have to turn the water off to install the new line; the only time the water had to be turned off was to make a connection off the old line.

{¶6}   McDonald became aware of the break at issue between 6:00 a.m. and 7:00 a.m.  He probably learned about it from the mayor.  Within a matter of minutes, he got in touch with David Chapman, one of the village water operators, about going out to assess the situation.  To turn off the water, Chapman had to close the valve closest to the Darlings' house in the boat ramp driveway, which was in a valve box a few feet underground.  McDonald testified that after Chapman shut the valve off, he called out the digging crew, which included Charles Stevens, the equipment operator.  McDonald got to the break site sometime between 7:00 a.m. and 8:00 a.m., looked at the break, and assessed the situation. McDonald testified that the break occurred in the old main line. He testified that the village has not been able to determine what caused the break. McDonald also testified that the village's leak detection system is "a pressure probe that is injected into the waterline."  There is "a pressure recorder on the main water system,"

and "if it detects a water loss or water depressurization," it alerts the first operator on the dialer list, Chapman, via phone.  McDonald testified that the system did not detect or alert to the break in this instance and that the village investigated the matter but "didn't find anything."  He was not able to determine why the system did not alert to the break. If the system had worked, the village would have responded to the break sooner.

### D.  Deposition Testimony of David Chapman

{¶7}    Chapman testified that no maintenance is done on the water lines because they are buried underground; the lines are just repaired if there is a break. The leak detection system "is based off the pressure system."  When there is a pressure drop, the system calls Chapman and gives him an alarm.  If he does not respond in a certain time, the system contacts McDonald. Chapman became aware of the leak by the Darlings' property between 6:00 a.m. and 7:00 a.m. while on his way to work. The leak detection system did not send an alarm regarding the leak though it should have as the leak would have caused a pressure drop. The system was operational, and Chapman was never able to determine why the alarm did not trigger. He testified that if the water had been turned off, and there was no service to the Darling property, the system would still be working.

{¶8}    Chapman testified that upon learning of the leak, he immediately went to determine where it was and shut the water off within a matter of minutes. When asked which valve he had to turn off to stop the leak, Chapman testified that he turned off the valve at the boat ramp entrance beside the Darlings' house. He later testified that two valves provided water to the Darlings' property and that he "shut down both valves." Chapman testified that he was unable to determine how long the water had been leaking,

but it would not be fair to say it had been leaking for a while based on the condition of the property because a main water line break releases an "abundant amount of water" which "erodes the ground." Chapman also testified that Tribute performed all the work on the village's water line replacement project except that village employees would "turn a valve off when" Tribute "needed something turned off." Chapman did not recall whether the Darlings' property was being serviced by the old line or the new line when the leak occurred.

### E. Deposition Testimony of Richard Allen

{¶9}     Richard Allen testified that he lives eight to ten houses from the Darlings. On May 26, 2022, around 10:30 p.m., Mr. Darling called and asked if his water was off. Allen checked and said it was. His water was out all night. On May 27, 2022, Mr. Darling told him about the break, and Allen went to the scene around 8:00 a.m. The water was "still pouring" at that time, and Stevens arrived around 8:20 or 8:30 a.m.

### F. Deposition Testimony of Charles Stevens

{¶10}  Stevens was the village's utilities maintenance foreman at the time of the break at issue. His responsibilities were "overseeing the crew, making sure everything got done, repaired, fixed." Chapman told Stevens about the break when he clocked in for his normal shift, which he thought was at 8:00 a.m. Stevens testified that the village's water lines were in bad shape, and the village had contracted with Tribute to replace some lines. The line which broke in this case was an old main line which was in the process of being taken out of service. He did not know when that line had been installed but guessed its natural lifespan was 60 years based on the average replacement time for the line type.

{¶11} Stevens testified that the first step in responding to a break is to turn the line off, which Chapman did in this instance. The village has a looped water system with multiple valves. A valve "is basically a stop," and if you close a valve, "it stops the flow from going through the pipe into the adjoining joint." Stevens testified that if one valve is closed, the system can still feed residents water due to the looping nature of the line. In this case, the break was between the Ferry Street valve, which is by a boat ramp less than a hundred feet from the Darlings' residence, and the Ashland Drive valve, which was six to eight blocks away. McDonald told Stevens that the night before, he was out with the contractor and closed the Ferry Street valve. Stevens testified that the contractor was working "[w]ithin, I'm guessing, four or five blocks probably" of the Darlings' property. Stevens did not know why McDonald closed the valve. However, he testified that McDonald would have to shut valves down if Tribute struck the old line and might have shut down the Ferry Street valve to decrease the time it would take to "kill" the old line if Tribute struck it while installing the new one. Stevens testified that he saw that the Ferry Street valve was closed and that it was not possible someone closed it the morning of the repair, before he arrived. Stevens followed Chapman that morning and saw him drive past the Ferry Street valve without attempting to shut it off, directly to the Ashland Drive valve. When Chapman closed the Ashland Drive valve, it "killed the water."

{¶12} Stevens testified that his responsibility in responding to the break was to operate a mini hoe. He did not know when the break occurred but testified that you could tell water had been leaking for several hours by the look of the grass and surrounding area. Stevens testified that in his opinion, McDonald's actions contributed to the break "[b]ecause the previous breaks from the contractor where the line had been drained had

air in it. So . . . when [McDonald] closed the valve at the boat ramp, there's no air releases there. So when they opened the valve up at Ashland Drive, it shoved all the air over against the closed valve on Ferry." He testified that the break occurred because water compressed the air against the closed valve. Stevens testified that "with the valve being off, there is no way to remove the air out of that line," and "[w]hen you compress air in a line with water behind it, it erupts violently." This is called an "air hammer" or "water hammer."

{¶13} Stevens testified that the leak detection system did not alert to the break because McDonald turned off the Ferry Street valve. He testified that the system detects decreases in pressure and increases in flow. He testified that closing a valve "basically dead-ends that line. The pressure thing in the plant cannot read a pressure loss because it's hitting that valve," "and there's no water flowing through it," so there is no pressure. Stevens testified that without a working leak detection system, the only way to know when the break occurred was from the computer system's flow meters, which may have picked up on an increased flow. But the flow meters do not send out an alert and are not monitored overnight. Stevens testified that McDonald should have not have closed the Ferry Street valve to reduce the response time in the event of a line strike. He should have left the valve open so the leak detection system worked and only turned valves off if the contractor struck a line. Stevens testified that if a valve is closed, it would be appropriate to have someone monitor flows overnight to detect leaks.

G.  Summary Judgment Proceedings

{¶14} The village moved for summary judgment on the ground that it was immune from liability under R.C. Chapter 2744. The village asserted that it was a political

subdivision and that political subdivisions are immune from tort liability under R.C. 2744.02(A)(1). The village acknowledged R.C. 2744.02(B)(2) contains an immunity exception for negligent performance of acts with respect to a proprietary function and that the maintenance and operation of a utility is a propriety function. However, the village asserted the Darlings could not establish negligence. The village also asserted that it was entitled to reinstatement of immunity under R.C. 2744.03(A)(3) or R.C. 2744.02(A)(5).

{¶15} In response, the Darlings conceded the village was a political subdivision but suggested there were genuine issues of material fact as to whether the exception to immunity in R.C. 2744.02(B)(2) applied. They maintained that there were factual disputes as to why the break occurred, when it occurred, and why the leak detection system failed. They claimed Stevens' deposition testimony provided evidence that McDonald's closure of the Ferry Street valve caused the water break. They also claimed that the village was negligent in the timing and manner in which it repaired the break. They asserted that Stevens' deposition testimony provided evidence that McDonald's closure of the Ferry Street valve caused the leak detection system to be inoperable, that McDonald knew or should have known this and that manual supervision of the system was necessary to monitor for leaks, and that the village admitted that if the leak detection system had worked, it likely would have marshaled personnel to respond to the break in a timelier manner. The Darlings also asserted that the village's reliance on R.C. 2744.03 was misplaced.

{¶16} In its reply brief, the village maintained that the Darlings had "designated the issue of the valve as the proximate cause of their damages" and that they could not prove negligence because they relied solely on hearsay, speculation and conjecture to

establish breach of duty and proximate cause. The village asserted that Stevens' testimony that McDonald said he closed the Ferry Street valve was inadmissible hearsay and did not qualify as an admission by a party-opponent under Evid.R. 801(D)(2). The village also asserted that Stevens' opinions that McDonald's alleged closure of the valve caused the break and rendered the leak detection system inoperable were inadmissible. The village asserted that the testimony was based on conjecture and speculation and was prejudicial under Evid.R. 403. Alternatively, the village asserted that even if the court considered Stevens' testimony, the village was entitled to immunity under R.C. 2744.03(A)(5).

## H. Summary Judgment Decision

**{¶17}** The trial court denied the village's summary judgment motion. The court found the immunity exception in R.C. 2744.02(B)(2) for the negligent performance of acts by a political subdivision employee with respect to a proprietary function applied. The court explained that a political subdivision's operation of a water system is a proprietary function. The court also explained that the village admitted the water distribution system had an alarm that triggers when there is low pressure, that the alarm did not trigger as it should have, and that the village was never able to determine why. Construing these statements in the Darlings' favor, the court found "a question of fact exists as to whether the leak detection system and alarm's failure to trigger were attributable to negligence on the part of the defendant and attributed to the injuries and damages . . . allegedly sustained by the plaintiffs." The court then stated:

> Further, and aside from the leak detection system's failure to detect the low flow, the defendant's water line replacement project appears to have been necessary maintenance on a system that had been in service for "70 years." The plaintiffs proffered deposition testimony from Charlie Stevens who said

that the cause of the water line break may have been a direct a proximate result of actions taken by the village administrator.  The defendant took issue with Mr. Stevens' statements in its reply, arguing that the court should disregard the same as inadmissible hearsay.  By attributing the statements to the village administrator, however, Mr. Stevens' testimony would not be hearsay, but rather an admission by party opponent under Evid.R. 801(D)(2).

The court also found the village was not entitled to a reinstatement of immunity. This appeal followed.[3]

## II.  ASSIGNMENTS OF ERROR

**{¶18}**  The village presents four assignments of error:

Assignment of Error No. 1: The Trial Court erred in finding political subdivision immunity in R.C. 2744.03(A)(3) did not apply to the Village of South Point, Ohio.

Assignment of Error No. 2: The Trial Court erred in finding political subdivision immunity in R.C. 2744.03(A)(5) did not apply to the Village of South Point, Ohio.

Assignment of Error No. 3: The Trial Court erred in considering the testimony of Charles Stevens for purposes of summary judgment.

Assignment of Error No. 4: The Trial Court erred when it found questions of fact existed regarding the leak detection system.

## III.  STANDARDS OF REVIEW

**{¶19}**  "'Whether a party is entitled to immunity is a question of law properly determined by the court prior to trial pursuant to a motion for summary judgment.'" *McConnell v. Dudley*, 2019-Ohio-4740, ¶ 17, quoting *Pelletier v. Campbell*, 2018-Ohio-2121, ¶ 12.  "'The review of a summary judgment denying political-subdivision immunity

---

[3] "When a trial court denies a motion in which a political subdivision . . . seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and is therefore a final, appealable order pursuant to R.C. 2744.02(C)."  *Hubbell v. Xenia*, 2007-Ohio-4839, syllabus.

is de novo and is governed by the summary-judgment standard set forth in Civ.R. 56.'"

*Id.* at ¶ 18, quoting *Pelletier* at ¶ 13.

**{¶20}** Civ.R. 56(C) states:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

Therefore, summary judgment is appropriate when:

"'(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.'"

(Bracketed text in original.) *McConnell* at ¶ 18, quoting *Pelletier* at ¶ 13, quoting *M.H. v. Cuyahoga Falls*, 2012-Ohio-5336, ¶ 12, quoting *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**{¶21}** "'"Under Civ.R. 56, the moving party bears the initial burden to inform the trial court of the basis for the motion and to identify those portions of the record that demonstrate the absence of a material fact."'" *Kerns v. Hale*, 2024-Ohio-2061, ¶ 9 (4th Dist.), quoting *Wise v. E. Hall Funeral Home, Inc.*, 2022-Ohio-394, ¶ 9 (4th Dist.), quoting *Dillon v. Siniff*, 2012-Ohio-910, ¶ 17 (4th Dist.). "If 'the moving party satisfies its burden, the nonmoving party bears a corresponding duty to set forth specific facts to show that a genuine issue exists.'" *Id.* at ¶ 10, quoting *Worthy v. Hawthorne*, 2021-Ohio-813, ¶ 16

(4th Dist.), citing Civ.R. 56(E). "'"Mere speculation and unsupported conclusory assertions are not sufficient'" to meet the nonmovant's reciprocal burden to set forth specific facts to show that a genuine issue exists.'" *Id.*, quoting *Hawthorne* at ¶ 17, quoting *Bank of New York Mellon v. Bobo*, 2015-Ohio-4601, ¶ 13 (4th Dist.), quoting *Loveday v. Essential Heating Cooling & Refrig., Inc.*, 2008-Ohio-4756, ¶ 9 (4th Dist.). "Rather, '[t]o survive summary judgment, the non-moving party must produce evidence showing that a genuine issue of fact exists concerning any issue for which the non-moving party bears the burden of proof.'" (Bracketed text in original.) *Id.*, quoting *Watters v. Ross Cty. Children's Servs.*, 2000 WL 228254, *3 (4th Dist. Feb. 18, 2000), citing Civ.R. 56(E). "'"If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."'" *Id.*, quoting *Graf v. Nelsonville*, 2019-Ohio-2386, ¶ 39 (4th Dist.), quoting Civ.R. 56(E).

**{¶22}** "'"Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review."'" *Payne v. Rumpke*, 2023-Ohio-4760, ¶ 31 (4th Dist.) ("*Payne*"), quoting *DeepRock Disposal Solutions, LLC v. Forté Prods., LLC,* 2021-Ohio-1436, ¶ 40 (4th Dist.), quoting *Estate of Johnson v. Randall Smith, Inc.,* 2013-Ohio-1507, ¶ 22. "A decision constitutes an abuse of discretion when it is unreasonable, arbitrary, or unconscionable." *Knab v. Washington Cty. Bd. of Commrs.*, 2024-Ohio-1569, ¶ 41 (4th Dist.). When applying this standard, we may not substitute our judgment for that of the trial court. *Id.*

IV.  STATUTORY SCHEME FOR POLITICAL SUBDIVISON IMMUNITY

**{¶23}** "R.C. Chapter 2744, the Political Subdivision Tort Liability Act, sets forth a comprehensive statutory scheme for the tort liability of political subdivisions and their

employees." *McConnell*, 2019-Ohio-4740, at ¶ 20. "'Determining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a familiar, three-tiered analysis.'" *Id.*, quoting *Pelletier*, 2018-Ohio-2121, at ¶ 15. The first tier "involves the general grant of immunity to political subdivisions by R.C. 2744.02(A)(1), which provides that 'a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.'" *Id.* at ¶ 21, quoting R.C. 2744.02(A)(1). The second tier "involves determining whether any of the five exceptions to immunity that are listed in R.C. 2744.02(B) apply to expose the political subdivision to liability." *Id.* at ¶ 22. "If any one of the five exceptions to immunity in R.C. 2744.02(B) applies and if any defenses that may be asserted by the political subdivision under R.C. 2744.02(B)(1) do not apply, then the third tier of the sovereign-immunity analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply to reinstate the political subdivision's immunity." *Id.* at ¶ 23.

{¶24} "'Once the political subdivision demonstrates that it is immune from tort liability under R.C. 2744.02(A)(1), the plaintiff bears the burden to show that one of the R.C. 2744.02(B) exceptions applies and removes the general grant of immunity.'" *Colley v. Crabtree*, 2024-Ohio-437, ¶ 93 (4th Dist.), quoting *Student Doe v. Adkins*, 2021-Ohio-3389, ¶ 23 (4th Dist.), citing *Martin v. Payne*, 2021-Ohio-1557, ¶ 40 (3d Dist.). "If the plaintiff establishes one or more of the R.C. 2744.02(B) exceptions that removes the political subdivision's liability, the political subdivision may then 'assert one of the R.C. 2744.03(A) defenses to re-instate immunity.'" *Id.* at ¶ 94, quoting *Adkins* at ¶ 23. In this

case, there is no dispute that the village is immune under R.C. 2744.02(A)(1). Instead, the dispute focuses on whether the exception to immunity in R.C. 2744.02(B)(2) applies, and if so, whether R.C. 2744.03(A)(3) or 2744.03(A)(5) reinstates immunity.

V. R.C. 2744.02(B)(2)

{¶25} R.C. 2744.02(B)(2) states that with exceptions not relevant here, "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions." "'[B]efore R.C. 2744.02(B)(2) will remove a political subdivision's immunity, the plaintiff must establish: (1) the elements required to sustain a negligence action-duty, breach, proximate cause, and damages; and (2) that the negligence arose out of a "proprietary function."'" *Anderson v. Warren Local School Dist. Bd. of Edn.*, 2017-Ohio-436, ¶ 42 (4th Dist.), quoting *Williams v. Glouster*, 2012-Ohio-1283, ¶ 17 (4th Dist.). A "proprietary function" includes "[t]he establishment, maintenance, and operation of a utility, including, . . . a municipal corporation water supply system[.]" R.C. 2744.01(G)(2)(c).

{¶26} During summary judgment proceedings, the Darlings essentially argued that R.C. 2744.02(B)(2) applied because McDonald's alleged closure of the Ferry Street valve was a negligent act with respect to a proprietary function which caused the break and caused the leak detection system failure, which delayed the repair of the break. The trial court indicated there were genuine issues of material fact regarding R.C. 2744.02(B)(2)'s application for two reasons. The court suggested Stevens' testimony created a genuine issue of fact as to whether McDonald caused the break, and the court found there was an issue of fact as to whether the village's negligence caused the failure

of the leak detection system because the village admitted the system failed and that the village was not able to determine why.[4]  Because the third and fourth assignments of error implicate these findings, we address them initially.

### A. Admissibility of Stevens' Testimony

### 1. Positions of the Parties

**{¶27}**  In the third assignment of error, the village contends the trial court erred in considering Stevens' testimony for purposes of summary judgment. Although the assignment of error is broadly stated, the village's argument does not challenge all Stevens' testimony.  The village seems to concede Stevens' testimony that McDonald said he closed the Ferry Street valve the night before the break was reported is admissible. The village's argument primarily focuses on Stevens' testimony that the alleged valve closure was the cause of the break and leak detection system failure. The village suggests such testimony is not admissible under Evid.R. 801(D)(2)(d) as statements by McDonald because Stevens testified to his own opinions, not McDonald's statements.   The village asserts that even if McDonald made a statement about causation, it would be inadmissible hearsay, not an admission by a party-opponent. In addition, the village asserts that Stevens' causation testimony is inadmissible speculation and conjecture.[5]  The village asserts Stevens provided no basis for his opinions. The

---

[4] As previously noted, the court's discussion of R.C. 2744.02(B)(2) included a statement that "the defendant's water line replacement project appears to have been necessary maintenance on a system that had been in service for '70 years.'" The court did not explain how this statement tied into its R.C. 2744.02(B)(2) analysis before it proceeded to discuss Stevens' testimony about McDonald causing the break.  We observe that in the Darlings' response to the village's summary judgment motion, the Darlings did not assert that the water line broke due to its age, that the village was negligent for not replacing the line sooner, or that R.C. 2744.02(B)(2) excepted such negligence from immunity.

[5] The village also asserts that Stevens admitted that he speculated about whether McDonald had a reason to close the Ferry Street valve. However, the reason McDonald allegedly closed the valve is immaterial because as we explain later in this decision, there is no evidence the closure caused the break or leak detection system failure.

village also asserts that his opinions are beyond the experience or knowledge of a lay person, so to offer them, Stevens had to be, but was not identified or certified as, an expert witness. And even if Stevens had been certified as an expert, the village asserts that he still cannot offer opinions based on speculation or conjecture.

**{¶28}** The Darlings contend that Stevens did not have to be qualified as an expert witness for the court to consider his opinion testimony. They assert that Stevens heard McDonald say he closed the Ferry Street valve and watched Chapman drive past the valve and turn off the Ashland Drive valve. They further assert that Stevens "explained how the water system worked based on his knowledge and experience." And they maintain that Stevens' opinion that McDonald caused a water hammer which broke the main line was based on his conversation with McDonald, his observations of Chapman, and his years of experience as the village's utilities maintenance foreman. Thus, they assert that Stevens provided reliable, credible testimony which the court correctly considered when it denied the village summary judgment.

### 2. Analysis

**{¶29}** The trial court abused its discretion when it considered Stevens' testimony that the alleged valve closure caused the break and leak detection system failure.[6] This testimony is not admissible under Evid.R. 801(D)(2). Evid.R. 801(C) states: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Hearsay

---

[6] Although the court did not specifically mention Stevens' testimony about the cause of the leak detection system failure in its decision, we presume the court overruled the village's objection to that testimony. *See generally Knab v. Washington Cty. Bd. of Commrs.*, 2024-Ohio-1569, ¶ 42 (4th Dist.) (presuming court overruled objection to evidentiary material made in reply memorandum during summary judgment proceedings when the court did not specifically rule on the propriety of the evidentiary material).

is not admissible unless an exception applies.  Evid.R. 802.  Evid.R. 801(D)(2) provides that a statement is not hearsay if it is offered against a party and fits in one of five categories.  Relevant here, Evid.R. 801(D)(2)(d) applies if the statement is "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."[7]  When Stevens testified about causation, he was not repeating statements McDonald allegedly made while an agent or servant of the village.  Rather, Stevens was testifying to his own opinions after termination of his employment with the village.[8]  Thus, his causation testimony did not constitute admissions by a party-opponent.

{¶30} Moreover, Stevens' lay opinions on causation are inadmissible.  Evid.R. 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

"'Perception connotes sense: visual, auditory, olfactory, etc. Thus, opinion testimony under Evid.R. 701 must be based on firsthand, sensory based knowledge."  *Brown v. Burnett*, 2020-Ohio-297, ¶ 64 (2d Dist.), quoting *Sec. Natl. Bank & Trust Co. v. Reynolds*, 2008-Ohio-4145, ¶ 17 (2d Dist.)

---

[7] Though not mentioned by the parties, we observe that Mr. Darling and Allen testified that the mayor said the village was at fault. However, the Darlings did not rely on this testimony in the summary judgment proceedings, and no argument has been made that any hearsay exception applies to this testimony or that it is not hearsay under Evid.R. 801(D).  "Absent an exception, hearsay may not be considered in a motion for summary judgment, and we may not consider it on appeal."  *AEGIS, LLC v. Schlorman*, 2024-Ohio-3325, ¶ 28 (2d Dist.).  Therefore, we will not consider this testimony.

[8] The village's reply brief in support of its motion for summary judgment could have been clearer on this point.  At one point, the brief suggests Stevens did testify that McDonald said the valve closure rendered the leak detection system inoperable.  However, this is plainly not the case, and the reply brief also correctly indicated that Stevens' testimony about the cause of the leak detection system failure was his own belief.

**{¶31}** "Evid.R. 701 limits the trial court's decision as to admissibility of lay witness opinion testimony in two ways." *State v. Sibert*, 98 Ohio App.3d 412, 426 (4th Dist. 1994). "First, the witness must have firsthand knowledge of the subject of the testimony and the opinion must be one a rational person would form based on the observed facts." *Id.* "Second, the opinion must assist the trier of fact in understanding the testimony of the witness or in determining a fact in issue." *Id.* "If the lay witness' opinion is not rationally based on his or her perception, then the opinion is speculation, and as such, cannot be helpful to a determination of a fact in issue." *State v. Gearhart*, 2018-Ohio-4180, ¶ 16 (12th Dist.), citing *State v. Feerer*, 2008-Ohio-6766, ¶ 23 (12th Dist.).

**{¶32}** Stevens' opinion that McDonald's closure of the Ferry Street valve caused the water line break is speculative. Stevens testified that there was air in the line due to previous breaks, the air was "shoved" against the closed valve when "they opened the valve up at Ashland Drive," water compressed the air against the closed valve, and this compression caused the line to break. The morning of the repair, Stevens saw Chapman drive past the Ferry Street valve without attempting to shut it off, saw that the valve was already closed, and heard McDonald say he closed the valve the night before. However, Stevens was not present when the break occurred. He did not perceive the air he claimed was in the line, which was buried underground. He offered no explanation for how he knew the Ashland Drive valve had been closed and then reopened by unidentified persons after McDonald allegedly closed the Ferry Street valve. He did not perceive water in the line compressing air against the Ferry Street valve before the break. And though he was at the scene of the break and assisted with the repair, he did not testify to any observations he made then which support the conclusion that the break occurred

because McDonald closed the Ferry Street valve.  Stevens' opinion that the alleged valve closure caused the break is not one a rational person would form based on the observed facts; it was not rationally based on his perception.

**{¶33}** Stevens' opinion that McDonald's closure of the Ferry Street valve caused the leak detection system failure is also speculative.  Stevens testified that the system detects decreases in pressure, that closing a valve "basically dead-ends that line," that "[t]he pressure thing in the plant cannot read a pressure loss because it's hitting that valve," "and that "there's no water flowing through it," so there is no pressure. Stevens did not perceive "[t]he pressure thing" in the plant hit the Ferry Street valve.  His opinion that the leak detection system failed because of the alleged valve closure is not one a rational person would form based on the observed facts; it was not rationally based on his perception.

**{¶34}** Because Stevens' opinions are speculative, the trial court erred when it considered them, and we sustain the third assignment of error.  Next, we must consider the impact of this determination.

### B.  Cause of the Water Break

**{¶35}** "'Liability in negligence is dependent upon the existence of a proximate cause relationship between breach of duty and injury suffered.'"  *Payne*, 2023-Ohio-4760, ¶ 22 (4th Dist.), quoting *Hester v. Dwivedi,* 89 Ohio St.3d 575, 583 (2000).  "[I]t is not enough for a plaintiff to speculate that a defendant's action or failure to act might have caused an injury."  *Id.* at ¶ 24, citing *Garrett Well LLC v. Frick-Gallagher Mfg. Co.,* 2021-Ohio-160, ¶ 43 (4th Dist.).  "'Causation requires a factual nexus between the breach and injury (i.e., actual cause) and a significant degree of connectedness that justifies imposing

liability (i.e., proximate cause).'" *Id.* at ¶ 22, quoting *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assocs., Inc.,* 2006-Ohio-942, ¶ 40 (Moyer, C.J., concurring in syllabus and judgment only), citing *Hester* at 581. "Ordinarily, proximate cause is a question of fact for the jury." *Westfall v. Lemon*, 2015-Ohio-384, ¶ 23 (4th Dist.), citing *Strother v. Hutchinson,* 67 Ohio St.2d 282, 288 (1981). "However, '"where no facts are alleged justifying any reasonable inference that the acts or failure of the defendant constitute the proximate cause of the injury, there is nothing for the jury [to decide], and, as a matter of law, judgment must be given for the defendant."'" (Bracketed material in original.) *Id.*, quoting *Kemerer v. Antwerp Bd. of Edn.,* 105 Ohio App.3d 792, 796 (3d Dist. 1995), quoting *Case v. Miami Chevrolet Co.*, 38 Ohio App. 41, 45-46 (1st Dist. 1930).

**{¶36}** In finding the immunity exception in R.C. 2744.02(B)(2) applied, the trial court indicated there were genuine issues of material fact as to whether McDonald caused the water line break by closing the Ferry Street valve. The court relied on Stevens' speculative opinion testimony, which is inadmissible. Without Stevens' testimony, the Darlings have no summary judgment evidence to support their contention that the alleged valve closure caused the break. The only evidence is that the village was unable to determine the cause. Therefore, the trial court erred when it indicated genuine issues of material fact existed regarding whether McDonald caused the break.

### C. Cause of the Leak Detection System Failure

**{¶37}** In the fourth assignment of error, the village contends that the trial court erred when it found questions of fact existed regarding the leak detection system. The village asserts that if the trial court intended for Stevens' testimony to serve as the basis for this finding, that testimony should be excluded for the reasons set forth in the third

assignment of error. The village further asserts that the record shows an absence of facts regarding why the leak detection system failed and that the trial court misconstrued this absence of fact as a genuine issue of material fact. The village highlights McDonald's testimony that the village investigated to determine why the system failed and did not find anything and Chapman's testimony that he was never able to determine why no alarm triggered. Based on this testimony, the village asserts the record establishes that the cause of the failure is unknown, and the village asserts that the Darlings presented no admissible evidence showing it was caused by an act of a village employee.

{¶38} The Darlings contend that the record shows a genuine issue as to why the leak detection system did not trigger an alarm in this instance. The Darlings assert that Chapman testified the system was working on May 26-27, 2022, that the system should have issued an alarm for the break, and that "if a valve was closed, water would stop going through it, and the alarm would not be able to detect a pressure drop." They also assert that Chapman gave inconsistent testimony about the number of valves he closed— first testifying he closed the Ferry Street valve and later testifying that he closed two valves. The Darlings claim this testimony is contradicted by Stevens' observation that Chapman only closed the Ashland Drive valve. In addition, they assert that the village provided no explanation to contradict Stevens' testimony that the leak detection system failed because McDonald closed the Ferry Street valve the night before the leak was discovered.

{¶39} The trial court did not specifically rely on Stevens' testimony in finding that there was a genuine issue of material fact with respect to the leak detection system failure. But without Stevens' causation testimony, which is inadmissible, the Darlings have no

summary judgment evidence to support their contention that McDonald's closure of the valve caused the failure. Contrary to what the Darlings assert, Chapman did not agree that "if a valve was closed, water would stop going through it, and the alarm would not be able to detect a pressure drop." Chapman testified that the system alerts to drops in pressure, but he did not testify that the system would not work if a single valve was closed.

**{¶40}** The fact that the leak detection system failed and the village did not know why is insufficient to create a genuine issue of material fact. "[A]ny disputed material facts must present genuine issues, meaning that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Buffenbarger v. Estate of Meyer*, 2023-Ohio-2760, ¶ 29 (4th Dist.), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "For this reason, the summary-judgment evidence must reveal more than 'some metaphysical doubt as to the material facts.'" (Footnote omitted in original.) *Id.*, quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Accordingly, if 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" (Citation omitted in original.) *Id.*, quoting *Matsushita Elec. Indus. Co.* at 587. In this case, the record taken as a whole could not lead a rational trier of fact to find that the leak detection system failed due to McDonald's alleged closure of the Ferry Street valve. Therefore, the trial court erred when it found genuine issues of material fact existed as to the leak detection system, and we sustain the fourth assignment of error.

## D. Conclusion

**{¶41}** The village discharged its initial summary judgment burden. Having sustained the third and fourth assignments of error, we conclude the Darlings failed to

discharge their reciprocal burden to demonstrate the existence of a genuine issue of material fact regarding the applicability of an immunity exception.  Consequently, the trial court erred when it concluded the exception in R.C. 2744.02(B)(2) applied and denied the village's motion for summary judgment.  We reverse the trial court's judgment and remand for it to enter summary judgment in favor of the village and for further proceedings consistent with this opinion.  This decision renders moot the first and second assignments of error, which pertain to the third tier of the immunity analysis, so we need not address them.  App.R. 12(A)(1)(c).

JUDGMENT REVERSED
AND CAUSED REMANDED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS REVERSED and that the CAUSE IS REMANDED. Appellees shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
       Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**